UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :   06 Civ. 6475 (DLC)
In re WEST PAN, INC.,                    :   06 Civ. 6691 (DLC)
                         Debtor.         :
                                        :   OPINION & ORDER
----------------------------------------X
                                        :
WEST PAN, INC.,                          :
                         Plaintiff,      :
                                        :
             -v-                         :
                                        :
MARTHA PERRY, ALVIN TRENK, PIZZA         :
PIAZZA, INC., PIZZA PIAZZA OF NEW        :
JERSEY, INC., PIAZZA MIA, INC.,          :
TECHTRON, INC., and PIZZA PIAZZA OF NEW  :
YORK, INC.,                              :
                         Defendants.     :
                                        :
----------------------------------------X

Appearances

For Appellant West Pan, Inc.:
Arnold M. Weiss
Michael S. Hiller
Weiss & Hiller, PC
600 Madison Avenue
New York, NY 10022

For Appellee and Cross-Appellant Techtron, Inc. and Alvin S.
Trenk:
Philip Rosenbach
Berman Rosenbach, P.C.
10 Madison Avenue, P.O. Box 1916
Morristown, NJ 07962-1916

For Appellee Martha Perry:
Thomas Flinn
Garrity, Graham, Murphy, Garofalo & Flinn, P.C.
One Lackawanna Plaza
P.O. Box 4205
Montclair, NJ 07042-8205

DENISE COTE, District Judge:

This cross-appeal arises out of the failed joint business venture between the debtor and appellant West Pan, Inc. ("West Pan") and appellee and cross-appellant Alvin S. Trenk ("Trenk") and Techtron, Inc. ("Techtron"). Following a 90-day bench trial, the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge for the Southern District of New York, issued a lengthy memorandum decision on August 22, 2003 ("Bankruptcy Opinion"), supplemented by an order on January 31, 2006 ("Bankruptcy Order"), both of which are the subjects of this appeal. For the following reasons, the Bankruptcy Opinion and the Bankruptcy Order are affirmed.

## Background

The following facts are taken from the Bankruptcy Opinion and are uncontested except where otherwise noted. The appeals concern lawsuits that have been pending since 1992 and include a voluminous record. The parties take very little issue with the description of the facts in the Bankruptcy Opinion, and indeed rely on it as the exclusive statement of facts for these appeals. The relevant facts for the issues raised on appeal are relatively few.

Since 1983, West Pan owned and operated a restaurant in New York called Pizza Piazza ("PPNY"), which was a premium pizza

restaurant with distinctive decorations, recipes, and other
details.  Seeking to replicate the concept of Pizza Piazza in
other locations, West Pan entered into a joint venture with
Techtron, an investment vehicle Trenk had used for various
business ventures.  On February 12, 1991, West Pan and Techtron
executed an Incorporation and Shareholders Agreement ("I&S
Agreement"), which created Pizza Piazza, Inc. ("PPI") to own and
operate the new Pizza Piazza restaurants as PPI subsidiaries,
including the existing PPNY restaurant.

Under the agreement, Techtron received 80% of the equity,
and West Pan received the remaining 20%.  Techtron maintained
complete management control of PPI and any new subsidiaries;
West Pan continued to control and operate PPNY.  The I&S
Agreement obligated Techtron to capitalize PPI with those funds
which in its discretion were prudent and sufficient to commence
PPI's operations, including up to $300,000 of its own money.
Techtron was not obligated to contribute or loan additional
funds to PPI, but could choose to do so in its sole and
exclusive discretion.

The agreement had several provisions that are important to
this appeal.  It restricted transfer of West Pan's assets in its
"Covenant Not to Encumber":

> [PPI], its acquiring subsidary [sic] and Techtron
> <u>shall not</u> sell, transfer, mortgage, pledge, <u>encumber</u>,
> hypothecate, <u>or otherwise permit any lien</u>, attachment,

> or execution <u>to impair the ownership of those assets being purchased from West Pan</u> . . . so long as West Pan has not been paid all monies due West Pan.

I&S Agreement § 2.4 (emphasis supplied).

The agreement set forth obligations in the event of a public offering, and also in the event that there was no public offering.

> In the event the public offering or other secondary financing described in Section 4.2 produces a total of Three Million Five Hundred Thousand ($3,500,000) Dollars or less . . . then the Asset Purchase Note and the Phase Two Bonus shall be paid at West Pan's election by (a) [PPI] by paying West Pan ten (10%) percent . . . or (b) by following the Payment Schedule . . . .

<u>Id.</u> § 4.3.  In the event of "No Public Offering":

> In the event the public offering and/or secondary financing is not obtained within the time prescribed, <u>at Techtron's option</u>: (a) <u>ownership of [PPI] shall be transferred to West Pan</u> and Techtron shall be given a general release from West Pan . . . in consideration thereof; <u>or</u>, (b) <u>Techtron will cause an additional ten (10%) percent equity in [PPI] to be transferred</u> to West Pan or its designees.

<u>Id.</u> § 4.5 (emphasis supplied).  In addition, if Techtron elects for the option in Section 4.5(b), Section 4.6 governs the payment schedule.

Article Ten of the agreement covers the event of Techtron's breach of the agreement:

> In the event Techtron shall materially breach this Agreement, <u>West Pan's sole and exclusive remedy shall be to receive the stock of [PPNY]</u> from [PPI] and thereby the return of the Assets (including the exclusive right to the name Pizza Piazza) . . . . Upon

receipt of such stock, West Pan shall have no further claims or rights against Techtron or [PPI] or any subsidiary thereof.

Id. § 10.1 (emphasis supplied).  Article Eleven provides for indemnification, including the payment of attorneys' fees:

> Techtron hereby indemnifies and agrees to hold West Pan harmless from and after the Closing from and against any and all claims, losses, expenses, damages deficiencies and liabilities including court costs and reasonable attorney's fees and costs arising directly or indirectly out of any misrepresentation, breach of warranty, breach of covenant on the part of Techtron under this Agreement.

Id. § 11.1 (emphasis supplied).  Section 11.2 provides a parallel clause providing for indemnification by West Pan to Techtron and PPI for breaches by West Pan.  The agreement also includes a choice of law clause, providing that "[t]his Agreement shall be construed and enforced in accordance with the law of the State of Delaware."  Id. § 12.5.

In November 1991, a second Pizza Piazza restaurant was opened in a mall in Menlo Park, New Jersey ("PPNJ").  It is the failure of this restaurant which is the subject of these appeals.  Techtron invested $530,000 in PPNJ, and obtained a line of credit to finance the operation.  Appellee Martha Perry ("Perry"), who was a long-time employee of Techtron, became the manager of PPNJ; at the time, she had extensive business and managerial experience, but not in the restaurant field.  Before PPNJ opened, West Pan told Trenk that sales of $30,000 per week

would be easy to achieve.  Unfortunately, the first few months
of PPNJ's operation were disappointing, and it lost a
significant amount of money.  The reason for such disappointing
sales is heavily disputed by the parties, with Techtron and
Perry primarily suggesting the restaurant's location, market
forces, and lack of demand, and West Pan blaming it on Perry's
inexperience with restaurant management.

At a contentious February 1992 board meeting, it was
decided that instead of Perry, the principles of West Pan,
Daniel Bloom ("Bloom") and Myron Siegel ("Siegel"), who had
started the original PPNY, would manage PPNJ for thirty days.
The revenue situation did not improve, however, and at the April
1992 board meeting, Trenk announced that Techtron was no longer
going to fund PPNJ.  Subsequently, he told Perry of his desire
to sell PPNJ, and Perry offered to buy it.  On June 1, Perry
purchased PPNJ with $400,000 cash and a $530,000 note.  Techtron
repaid the loans it had taken out to fund PPI with the cash it
received, including a bank loan which Trenk had personally
guaranteed, and Techtron kept the remaining $100,000.  After
purchasing PPNJ, Perry continued to operate the restaurant with
the same or similar decorations and menu, and publicized PPNJ as
Pizza Piazza without notice that there was new ownership.

In the last week of May, Trenk informed Bloom and Siegel of
the impending transfer to Perry.  They were shocked and

6

protested the transfer, claiming that Trenk had no authority to sell PPNJ.  On July 15, 1992, West Pan notified Trenk, Techtron, PPI, and Perry that the transfer constituted a breach, and soon after commenced a lawsuit.  Multiple actions were then filed in New Jersey Superior Court, including an action by West Pan against Perry and Trenk to restrain them from continuing to use West Pan's assets at PPNJ, such as the menus and the recipes. In the meantime, Trenk and Perry had a falling out, and after Perry defaulted on her note, she surrendered PPNJ to Trenk in March 1993.  After suffering losses until December 1993, Trenk eventually liquidated PPNJ for $60,000.  PPNY continued in business in New York until 1997.

## Procedural History

The New Jersey actions were consolidated and transferred to the Bankruptcy Court in this district in July 1995, following West Pan's filing for bankruptcy on July 25, 1994.  Trial of the New Jersey actions commenced as adversary proceedings in July 1997 and after 90 trial days spread over roughly two years, concluded on June 21, 1999.  A post-trial hearing was held in 2000, and the parties submitted post-trial briefs in 2001.  On August 22, 2003, the Bankruptcy Court issued its 123-page Bankruptcy Opinion regarding the joint venture between West Pan and Techtron.  The court determined that supplemental discovery

and proceedings were necessary to award punitive damages to West
Pan. A supplemental Bankruptcy Order was issued on January 31,
2006, attaching a transcript of a December 14, 2005 telephone
conference at which the substance of that Bankruptcy Order was
discussed. In that conference, the court announced that
punitive damages would not be awarded.

The Bankruptcy Opinion found that Techtron had breached
Section 2.4 of the I&S Agreement by putting a lien on West Pan's
assets, specifically the note given by Perry to Techtron in
connection with the June 1, 1992 transfer. Based on this
breach, the Bankruptcy Court found that Trenk and Perry were
liable to West Pan for tortious interference with the I&S
Agreement.[1] Furthermore, the Bankruptcy Court found that
Techtron breached its fiduciary duty to West Pan by obtaining a
secret benefit from the transfer of PPNJ to Perry and awarded
West Pan the $100,000 benefit Techtron retained.

The Bankruptcy Opinion also found that West Pan failed to
establish that Techtron breached Sections 4.5 and 4.6 of the I&S
Agreement -- which address benefits due to West Pan in the event
there is no public offering -- because Techtron had no

---

[1] The Bankruptcy Opinion noted that because Trenk acted outside
the scope of his agency, he could be liable for tortious
interference with a contract to which Techtron was a party, and
Trenk has not appealed this determination. The court determined
that Trenk had sold PPNJ to Perry to discharge his personal
guarantee of a bank loan to PPI.

obligation to choose either of the two options described in Section 4.5, especially in light of the contrasting language in Section 4.3, which triggered a mandatory payment to West Pan in the event there was a public offering.

A few rulings by the Bankruptcy Court have not been appealed, including its finding that West Pan failed to establish that Techtron breached Sections 2.3 and 4.1 of the I&S Agreement.  Section 2.3 requires Techtron to "capitalize PPI with those funds which in its sole and exclusive discretion are considered prudent and sufficient to commence [PPI]'s operations," while Section 4.1 required that "[a]ll parties to this Agreement will use their best reasonable efforts to complete Phase One [opening two additional restaurants] as soon as practicable."  The Bankruptcy Opinion found that Techtron had acted in good faith and with best reasonable efforts, and did not breach Sections 2.3 and 4.1.  The Bankruptcy Opinion further found that Techtron was not obliged to comply with previously agreed-upon terms that were not contained in the final written agreement, since the I&S Agreement contained an integration clause; that West Pan failed to establish that Trenk and Techtron tortiously induced PPNY to breach an agreement with West Pan; and that West Pan failed to prove that Techtron, Trenk, and Perry defrauded West Pan.

With regard to damages, as noted above, the Bankruptcy
Court awarded West Pan $100,000 from Techtron for its breach of
fiduciary duty.  The Bankruptcy Court found, however, that West
Pan was not entitled to damages of up to $7.79 million for the
breach of the covenant against encumbering assets contained in
Section 2.4 and tortious interference with contract.  Instead,
it held that West Pan had failed to establish its right to any
compensatory damages.  Based on the record evidence, including
expert testimony, the Bankruptcy Court found that, despite West
Pan's claim that Techtron and the others had destroyed PPNJ and
PPNY, "the more plausible explanation for [PPNJ]'s failure is
that a popular stand-alone restaurant in [] New York is no
guaranty of a successful replicated restaurant in Menlo Park,
New Jersey."  Moreover, the Bankruptcy Court found that any loss
to the PPNJ and PPNY business predated the June 1, 1992 transfer
to Perry.  The Bankruptcy Court nonetheless initially awarded $1
in nominal damages and ruled that West Pan was entitled to
punitive damages on the tortious interference claim.  That
decision, however, was later reconsidered and reversed.  The
Bankruptcy Order held that because there were no actual damages
to be awarded on the tortious interference claim, there could be
no award of punitive damages.  Finally, the Bankruptcy Court
found that West Pan was not entitled to costs and attorneys'
fees under the indemnification clause of Section 11.1, because

that section only applied to claims between West Pan and third parties, not to litigation between West Pan and Techtron.

Appellant West Pan appeals from the Bankruptcy Court's decision on multiple grounds.  It principally seeks to recover punitive damages and attorneys' fees.  It argues that the Bankruptcy Court erred by:  (1) ruling that punitive damages could not be awarded to West Pan; (2) denying West Pan's claim for attorneys' fees and costs; (3) misconstruing Section 4.5 of the I&S Agreement; (4) ruling that the transfer of the West Pan assets was perpetrated by PPI alone and not Techtron; (5) finding that Techtron, Trenk, and Perry did not breach their fiduciary duties to West Pan with respect to their management and control of the West Pan assets; and (6) ruling that West Pan failed to prove its damages.  Techtron cross-appeals the Bankruptcy's Court's order awarding West Pan $100,000 in damages, arguing that: (1) Techtron's liability as a result of Techtron's retention of $100,000 from the sale of PPNJ should have been at most $20,000; and (2) Techtron showed a legitimate justification for retaining the entire $100,000.[2]

---

[2] Trenk and Perry also raise various arguments relating to certain wiretaps, but the wiretaps issue was not noticed in this appeal, and is not further considered here.

<u>Discussion</u>

A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree."  Rule 8013, Fed. R. Bankr. P.  On appeal, the legal conclusions of the Bankruptcy Court are reviewed <u>de novo</u>, but the findings of fact are reversed only when they are "clearly erroneous."  <u>Kuhl v. United States</u>, 467 F.3d 145, 147 (2d Cir. 2006) (citation omitted) (per curiam); <u>In re Worldcom, Inc.</u>, 339 B.R. 836, 840 (S.D.N.Y. 2006).

I. West Pan's Appeal

The issues raised in West Pan's appeal are considered first.  West Pan has failed to show that the findings of fact made by the Bankruptcy Court after the lengthy trial were clearly erroneous.  Among other things, West Pan has not shown that the Bankruptcy Court erred in concluding that West Pan was <u>not</u> damaged by any of the misconduct associated with the June 1, 1992 sale of PPNJ to Perry.  The Bankruptcy Court's finding that PPNJ was by that date already a failed business is well supported in the record.  As a result, whatever legal error may have been committed by the Bankruptcy Court in rendering the Bankruptcy Opinion and Order entitles West Pan to no greater award.

A. Punitive Damages

West Pan appeals from the ruling in the Bankruptcy Order that punitive damages may not be awarded to West Pan on its tortious interference claim.  In the Bankruptcy Opinion, the court ruled that Trenk and Perry tortiously interfered with the I&S Agreement by inducing Techtron and PPI to breach Section 2.4 of the I&S Agreement by putting a lien on West Pan's assets in the form of the note from Perry to Techtron in connection with the transfer of PPNJ to Perry.

West Pan had sought a total award of damages of $7.79 million on its three claims, without distinguishing among the different theories as a basis for its damages.[3]  West Pan claimed that the damages were in each instance for the destruction of PPNJ and PPNY.  After much fact finding, the Bankruptcy Opinion found that West Pan had "failed to establish that it is entitled to any of the damages," and awarded "$1 dollar as nominal damages under [West Pan]'s contract and tort theories."  In the subsequent Bankruptcy Order addressing the amount of punitive damages to which West Pan was entitled for Trenk and Perry's tortious interference, the court found that because "actual damage is a required element of tortious interference with the contract complaints under New Jersey law," and there were "no

---

[3] To recap, the three claims were a claim against Trenk and Perry for tortious interference, and two claims against Techtron for breach of contract and breach of fiduciary duty.

actual damages," West Pan's tortious interference claim was dismissed and no punitive damages would be awarded.

This question of New Jersey law is considered <u>de novo</u>.[4]  In a widely cited decision, the New Jersey Supreme Court ruled in 1984 that "punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss, or detriment to the plaintiff has occurred."  <u>Nappe v. Anschelewitz, Barr, Ansell & Bonello</u>, 477 A.2d 1224, 1232 (N.J. 1984).  The <u>Nappe</u> case found in the fraud case before it, "that compensatory damages are not an essential element of an intentional tort . . . when there is some loss, detriment or injury, and that nominal damages may be awarded in such cases in the absence of compensatory damages."[5]  <u>Id.</u> at 1229-30.

The parties dispute the extent to which <u>Nappe</u>'s seemingly expansive ruling has continued viability.  Trenk relies in

---

[4] The I&S Agreement chose Delaware law for "constru[ing] and enforce[ing]" the agreement.  The Bankruptcy Court held that the Delaware choice of law clause was limited to issues relating to the interpretation of the agreement, while New Jersey law governed other issues arising out of the parties' relationship. None of the parties dispute the applicability of New Jersey law to a relationship centered in New Jersey.

[5] In 1995, New Jersey enacted a statute expressly declaring that "[p]unitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial.  An award of nominal damages cannot support an award of punitive damages." N.J. Stat. Ann. § 2A:15-5.13(c).  The statute only applies to cases filed after its October 27, 1995 effective date and thus has no application here.

particular on a series of cases following Nappe which found proof of actual damages to be an essential element of a tortious interference claim.   See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1168 n.7 (3d Cir. 1993) ("Nappe . . . held that the cause of action of intentional fraud does not require a showing of actual damages.  But given its language in Printing Mart, [infra,] the New Jersey Supreme Court does not seem to have extended this holding to the cause of action of tortious interference.") (citation omitted); Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 42 (N.J. 1989) (noting that "failure to satisfy the requirement for allegation of facts demonstrating that a plaintiff has suffered or will suffer damage can be fatal to a claim" of intentional interference); Norwood Easthill Assoc. v. Norwood Easthill Watch, 536 A.2d 1317, 1321 (N.J. Super. Ct. App. Div. 1988) (rejecting plaintiff's claim that despite "inability to prove actual damages, it should be allowed to obtain punitive damages" under Nappe, because plaintiff had not shown "any injury, loss, or detriment reasonably attributable to defendants' alleged malicious interference").

In this case at least, there is no necessary tension between the holding in Nappe and the line of cases addressing a tortious interference claim.  In Nappe, the jury was permitted to award punitive damages if it found that the defendant had

damaged the plaintiff but that the amount of damage was not
"computable." <u>Nappe</u>, 477 A.2d at 1233.  The defendant had
diverted the plaintiff's funds and thereby delayed a
construction project and reduced the plaintiff's profits "by an
uncertain amount." <u>Id.</u>  Thus, while there was no question that
the fraud in <u>Nappe</u> had caused a loss, the amount of the loss was
too uncertain to reduce to an award of compensatory damages.
Accordingly, <u>Nappe</u> held that "the requirement of actual damage
to sustain a cause of action for intentional torts no longer
serves a useful purpose, at least where a victim of an
intentional wrong has suffered some loss, detriment, or injury
but is unable to prove that he is entitled to compensatory
damages." <u>Id.</u> at 1229; <u>see Holmin v. TRW, Inc.</u>, 748 A.2d 1141,
1145 n.3 (N.J. Sup. Ct. App. Div. 2000) (holding that <u>Nappe</u> "is
consistent with the statement . . . that the suffering of some
damage is an essential part of the tort of fraud or deceit").

In this case, West Pan not only failed to show that it had
suffered any particular amount of loss, it also failed to show
that it sustained any damage properly attributable to Trenk or
Perry's tortious intereference.  Therefore, West Pan cannot
sustain a claim for punitive damages on the tortious
interference claim.

Moreover, to the extent some of the discussion in <u>Nappe</u>
might be read to support West Pan's argument that punitive

damages can be awarded for intentional torts where a plaintiff cannot show an actual injury or loss, Nappe, 477 A.2d at 1230, it is predicted that, if confronted today with this issue, the New Jersey Supreme Court would rule that punitive damages cannot be awarded on a tortious interference claim where plaintiff is unable to show actual damage.  Where the law of a state is "uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the . . . state would resolve the uncertainty or ambiguity."  Phansalkar v. Andersen Weinroth & Co., 344 F.3d 184, 199 (2d Cir. 2003) (citation omitted).  In doing so, federal courts must give "fullest weight to the decisions of a state's highest court," and "proper regard to the decisions of a state's lower courts." Id. (citation omitted).  Federal courts should also consider the decisions of federal courts construing state law, in particular the circuit court within whose jurisdiction the state at issue is located.  Id.; Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 421 (2d Cir. 2001).  As already described, the cases that have followed Nappe have emphasized its holding and the plaintiff's obligation to show some damage or loss.

Evolving Supreme Court jurisprudence would also guide the New Jersey Supreme Court.  Nappe was decided in 1984 and relied upon the proposition that a "punitive award is not required to have a fixed proportional relationship to the amount of

compensatory damages." <u>Nappe</u>, 477 A.2d at 1231.  That
proposition has since been expressly repudiated by the United
States Supreme Court, which held in 1996 that "exemplary damages
must bear a 'reasonable relationship' to compensatory damages."
<u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. 559, 580 (1996).  The
principle was subsequently refined to state that "in practice,
few awards exceeding a single-digit ratio between punitive and
compensatory damages, to a significant degree, will satisfy due
process."  <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S.
408, 425 (2003).  In light of this development in the law of
punitive damages, it is unlikely that New Jersey's highest court
would allow a punitive damages award without any award of
compensatory damages or proof of any loss or actual injury at
all.  The Bankruptcy Court's determination that punitive damages
cannot be awarded here for Trenk and Perry's tortious
interference is affirmed.


B. Attorneys' Fees and Costs Under Section 11.1 of the I&S
Agreement

West Pan seeks an award of attorneys' fees and contends
that the Bankruptcy Court erred when it relied on Section 11.1
from the I&S Agreement in ruling that West Pan could not recover
attorneys' fees despite prevailing on two of its claims.
Specifically, West Pan contends that the Bankruptcy Court was

required to rely on a stipulation between West Pan and Techtron on the meaning of Section 11.1, and could not independently construe the contract.

The stipulation provided that "Section 11.1 affords West Pan with a cause of action for damages and attorneys' fees in the event that Techtron violates § 2.4 and such damages and attorney's fees are proven by the applicable standard."[6]  The Bankruptcy Opinion held that the stipulation did not address the circumstances that would trigger an indemnification claim, and that its analysis was entirely consistent with the stipulation. It also ruled, however, that the court was free to disregard the stipulation to the extent the court's analysis was in conflict with it.

The Bankruptcy Opinion then ruled that Section 11.1 applied only to claims between third parties and West Pan, and not to litigation between the indemnitor and the indemnitee.  It cited several Delaware cases interpreting similar indemnification clauses, and further supported its conclusion by noting that Section 10.1 of the I&S Agreement unambiguously provided the exclusive remedy for breaches of the agreement by Techtron.

"Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court."

---

[6] The stipulation was included in the "Plaintiff's Statement of Facts" section of a 130-page Joint Pre-Trial Order, and was listed as item 65 in a list of 264 statements.

<u>PPX Enters., Inc. v. Audiofidelity, Inc.</u>, 746 F.2d 120, 123 (2d
Cir. 1984) (citation omitted).  A court, however, "is not bound
to accept stipulations regarding questions of law, nor may the
parties create a case by stipulating to facts that do not
exist."  <u>Sinicropi v. Milone</u>, 915 F.2d 66, 68 (2d Cir. 1990)
(citation omitted).  A court may also disregard a stipulation
"if it would be manifestly unjust to enforce the stipulation,"
<u>id.</u>, or "the evidence contrary to the stipulation is
substantial."  <u>PPX Enters.</u>, 746 F.2d at 123 (citation omitted).

"Under Delaware law, the interpretation of contract
language is treated as a question of law."[7]  <u>Rohn Indus., Inc. v.
Platinum Equity LLC</u>, 911 A.2d 379, 382 n.3 (Del. 2006) (citation
omitted).  The Bankruptcy Court's interpretation of the
indemnification clause is entirely consistent with Delaware law.
Indemnification clauses with terms tracking the language in
Section 11.1 apply only to third party actions and not to
actions between the indemnitor and the indemnitee.  <u>See, e.g.</u>,

<hr>

[7] West Pan argues that contract interpretation is a question of
law only where the contractual language is unambiguous.  When
read together, however, the language in Sections 10.1 and 11.1
is unambiguous, and the Bankruptcy Opinion does not suggest
otherwise.  West Pan contends that, because the parties have
presented "two contrasting interpretations" the contract must be
ambiguous.  But, "the language of a contract is not made
ambiguous simply because the parties urge different
interpretations."  <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,
Inc.</u>, 404 F.3d 566, 598 (2d Cir. 2005); <u>see Rhone-Poulenc Basic
Chems. Co. v. Am. Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del.
1992).

<u>Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.</u>, 394 A.2d
1160, 1165 (Del. 1978) (construing contract between general
contractor and subcontractor); <u>DRR, L.L.C. v. Sears, Roebuck &
Co.</u>, 949 F. Supp. 1132, 1142-43 (D. Del. 1996) (construing a
property sales contract).[8]

     While West Pan concentrates on those breaches which are
encompassed by Section 11.1, and argues forcefully that a third-
party suit is unlikely to follow such breaches, it virtually
ignores the most compelling part of the Bankruptcy Court's
analysis.  Section 10.1 of the I&S Agreement sets forth the
"sole and exclusive remedy" in a dispute between Techtron and
West Pan, and states that "West Pan shall have no further claims
or rights against Techtron."  West Pan is unable to distinguish
the breach of covenant remedies in Section 11.1 from the breach
of agreement remedies in Section 10.1.  It is a fundamental rule
of contract construction that "[w]hen interpreting a contract,
the Court must view the document as a whole, giving effect to
all of its provisions."  <u>Interim Healthcare, Inc. v. Spherion
Corp.</u>, 884 A.2d 513, 556 (Del. 2005).  Judge Gonzalez gave a

---

[8] West Pan claims that the Delaware case law on which the
Bankruptcy Court relied only applies where there is a duty to
defend.  While West Pan is correct that in each instance, the
clause also imposed a duty to defend, the Delaware case law
cited did not rely upon the "defend" provision to find that the
indemnification clause in the commercial contracts applied only
to claims brought by third parties.

compelling and consistent reading to each of these provisions.
The decision not to award attorneys' fees is affirmed.


C. Sections 4.5 and 4.6 of the I&S Agreement

West Pan appeals from the Bankruptcy Court's determination
that West Pan failed to establish that Techtron breached
Sections 4.5 and 4.6 of the I&S Agreement.  Section 4.5 sets
forth the course of action in the event there is no public
offering.  Upon de novo review, the Bankruptcy Court's
interpretation of the contractual language is clear error.

Section 4.5 requires Techtron to elect between one of the
two options.  In essence, if the joint venture did not succeed
within the allotted time frame, then Techtron could either
withdraw from the enterprise and obtain a general release, or
remain in the joint venture but give West Pan an increased
equity share.  The Bankruptcy Opinion construed Section 4.5 to
provide Techtron with the option of choosing either or neither
of these courses of action.  Section 4.5, however, clearly
requires Techtron to commit to one of the two actions, and does
not allow doing nothing as a third option.

The different interpretation of Section 4.5, however, does
not materially aid West Pan's claim against Techtron for breach
of Section 4.5.  On appeal, Techtron notes that in essence it
did return ownership of PPI to West Pan, therefore fulfilling

its obligation under Section 4.5(a), and in addition, that West Pan failed to show the availability of cash flow under Section 4.6's payment schedule, which governs if Techtron elects the option in Section 4.5(b) and grants West Pan greater equity. West Pan has little to say in response. It argues only that the $100,000 which Trenk kept from the sale of PPNJ to Perry should have been distributed per Section 4.6's payment schedule. Section 4.6, however, applies to cash flow from the operation of the restaurant, and West Pan was never able to show that PPNJ ever had a penny of positive cash flow. Therefore, despite the clear error in the Bankruptcy Court's interpretation of Section 4.5, its ruling dismissing West Pan's breach of contract claim against Techtron is affirmed.

D. Factual Findings

West Pan further appeals various factual findings made by the Bankruptcy Court. Factual findings by the Bankruptcy Court are reviewed under the "clearly erroneous" standard. As the Supreme Court has explained, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985). In other words, to reject a finding of fact as clearly erroneous, the court must, upon review of the entire record, be "left with the definite and firm conviction

that a mistake has been committed." <u>United States v. Snow</u>, 462
F.3d 55, 72 (2d Cir. 2006) (citation omitted).  At issue here
are the Bankruptcy Court's findings that transfer of West Pan's
assets through the June 1, 1992 sale to Perry was perpetrated by
PPI alone and not Techtron; that there was no breach of
fiduciary duty based on Perry's inexperienced management and
control of West Pan's assets prior to the transfer; and that
West Pan failed to show damages sustained.  The Bankruptcy
Court's determinations, with its significant engagement with the
vast factual record in this case, show no clear error, and the
factual findings of the Bankruptcy Court are affirmed.


II. Techtron's Appeal

    Techtron appeals from the Bankruptcy Court's award of
$100,000 in damages to West Pan for Techtron's breach of
fiduciary duty based on the sale of PPNJ to Perry and its
failure to share the proceeds with its joint venturer West Pan.
Techtron argues that its liability to West Pan should have at
most been $20,000, reflecting the 80-20 equity split between
Techtron and West Pan under the I&S Agreement.[9]

---

[9] West Pan claims that the argument was not raised below, but
Techtron's post-trial brief clearly anticipated apportionment of
any damages to be awarded to West Pan from the sale of PPNJ
under the I&S Agreement's 80-20 split.

Techtron breached its fiduciary duty to its joint venturer West Pan by retaining $100,000 from the sale of PPNJ to Perry. While $300,000 from the $400,000 in cash that was received from the sale went to repay the liabilities of the joint venture, Techtron kept the remaining $100,000, which belonged to the joint venture.  Courts can compel an accounting of secret profits where a fiduciary duty exists.  <u>Notch View Assocs. v. Smith</u>, 615 A.2d 676, 683 (N.J. Super. Ct. Law Div. 1992) (collecting cases).[10]  The Bankruptcy Court found that the $100,000 was a secret profit, and that Techtron had not established any justification for deductions from the $100,000. Techtron's only justification for reducing the award to $20,000 is that the $100,000 secret profit should have been returned to PPI, and under the 80-20 split, West Pan would only have been entitled to 20%.  Therefore, Techtron claims that to the extent damages are to make West Pan whole, it should only receive 20%.

Accounting of secret profits often arises in the corporate opportunity context, and New Jersey subscribes to Delaware's view on this issue, which allows "a trust in favor of the

---

[10] The Bankruptcy Court applied Delaware law, but the appropriate choice of law for determining the fiduciary duty issue is New Jersey law.  As noted above, the scope of the Delaware choice-of-law clause in the I&S Agreement is narrow, and since this claim arises out of the contract rather than interpreting the contract, New Jersey law should apply.  The analysis and the result, however, are the same, regardless of whether the applicable law is Delaware or New Jersey.

corporation upon the property, interests and profits so acquired." Valle v. N. Jersey Auto. Club, 359 A.2d 504, 507 (N.J. Super. Ct. App. Div. 1976) (citing Guth v. Loft, Inc., 5 A.2d 503, 511 (Del. 1939)). Where the fiduciary breaches this duty and "acquires gain or advantage for himself," in addition to the trust in favor of the corporation, the law "denies to the betrayer all benefit and profit." Borden v. Sinskey, 530 F.2d 478, 498 (3d Cir. 1976) (citing Guth, 5 A.2d at 510). Furthermore, a "joint adventurer owes no less a fiduciary duty to his co-adventurer than does one partner to the other." Silverstein v. Last, 383 A.2d 718, 721 (N.J. Super. App. Div. 1978). Under agency principles, if through a breach of fiduciary duty an agent "realize[s] a material benefit, the agent has a duty to account to the principal for the benefit, its value, or its proceeds." Restatement (Third) of Agency § 8.01 cmt. d(1) (2006). The agent may even be "required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty." Id. cmt. d(2).

The Bankruptcy Court's requirement that Techtron disgorge the $100,000 secret payment it retained was entirely consistent with these legal principles. The Bankruptcy Court did not find that Techtron had established any justification to allow it to retain any portion of the $100,000 it wrongfully obtained at the

expense of West Pan.[11]  The Bankruptcy Court's award of $100,000

to West Pan was appropriate in the circumstances and is

affirmed.

### Conclusion

The Bankruptcy Court's decision is affirmed.  The Clerk of

Court shall close this case.

SO ORDERED:

Dated:    New York, New York
          July 20, 2007

_____
                  DENISE COTE
          United States District Judge

---

[11] Techtron also argues that it should not be required to account
for any of the $100,000, because it had a "legitimate
justification" for retaining the full amount because Techtron
had contributed to the joint venture beyond its obligation.  The
argument is not fully developed, is unpersuasive, and can be
swiftly rejected.

27